Mark Borghese, Esq.
Nevada Bar No. 6231
**WEIDE & MILLER, LTD.**
7251 W. Lake Mead Blvd., Suite 530
Las Vegas, NV 89128
Tel. (702)-382-4804
Fax (702)-382-4805

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| PAT CLARK SPORTS, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CHAMPION TRAILER, INC., an Indiana corporation; CHAMPION TRAILER ACQUISITION COMPANY, LLC, an Indiana limited liability company; DC INVESTMENTS, LLC, an Indiana limited liability company; REELCRAFT INDUSTRIES, INC., an Indiana corporation; THE GATES CORPORATION, a Delaware corporation; and DOES I through X, inclusive.<br><br>Defendants. | Case No.: 2:06-cv-00180-PMP-LRL<br><br>**RESPONSE IN OPPOSITION TO DC INVESTMENTS RENEWED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P 12(b)(2) OR ALTERNATIVELY PURSUANT TO FED. R. CIV. P 12(b)(3)** |

Pat Clark Sports, Inc. ("PC Sports" or "Plaintiff"), by and through its attorneys, WEIDE & MILLER, LTD., files this response in opposition to DC Investments, LLC's ("DC Investments") Renewed Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) or alternatively pursuant to Fed. R. Civ. P. 12(b)(3). This opposition is based on the following:

   1.    Specific jurisdiction is present against DC Investments due to:

         a.    DC Investments' intentional commission of acts amounting to a fraudulent

transfer between it and Champion Trailer Acquisition Company, LLC ("Champion Trailer") of the Living Quarters Trailer at issue in this litigation; and

  b. The fact that DC Investments took these intentional acts with full knowledge of Plaintiff, with full knowledge of Plaintiff's rights, and with full knowledge that the intentional harm caused Plaintiff would be directed to Nevada, the corporation's sole place of business and where the custom trailer was to be delivered.

2. Venue is proper in Nevada against DC Investments, a corporation, as DC Investments is subject to personal jurisdiction in Nevada.

This opposition is supported by the following Memorandum of Points and Authorities and Exhibits 1 - 13, attached.

  DATED this 15th day of February, 2008.

        Respectfully Submitted,

        Weide & Miller, Ltd.

        _____
        Mark Borghese, Esq.
        7251 W. Lake Mead Blvd., Suite 530
        Las Vegas, NV 89128
        Attorneys for Plaintiff

MRB-W-1192v2.doc    2

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. RELEVANT FACTS

A.  *Living Quarter's Trailer Transferred with Actual Intent to Hinder, Delay or Defraud Plaintiff.*

On May 6, 2005, James Fairbanks, an attorney for plaintiff PC Sports, wrote to Champion Trailer[1] regarding the disputes the parties were having, including the dispute regarding the Living Quarters Trailer. Mr. Fairbanks stated in his letter:

> Until this matter has been resolved between the parties, we suggest it is in your best interest not to dispose of or take any further action regarding the unfinished living quarters trailer.

(See Exhibit 1, letter from James Fairbanks to Champion Trailer).

About a month later on June 10, 2005, Champion Trailer and an insider company, DC Investments, LLC put together a "Bill of Sale" document which purported to transfer the Living Quarters Trailer to DC Investment. This document fraudulently indicates,

> For and in consideration of the payment of Three Hundred Thousand and 00/100 Dollars ($300,000.00) **cash in hand, paid this day in full** by DC Investments, LLC…

See Exhibit 2, Bill of Sale [emphasis added]

It is undisputed that <u>no cash payment</u> was ever made. It is undisputed that <u>no payment</u> (cash or otherwise) was paid by DC Investments, LLC on June 10, 2005. In fact, the purported "payment" by DC Investments is claimed to have occurred more than six months later at the time

---

[1] As this Court is aware from prior papers on file, Champion Trailer, Inc. (which Plaintiff signed its contracts with) morphed into Champion Trailer Acquisition Company d/b/a Champion Trailer on or about January 31, 2003 by selling all of its assets and substantially all of its liabilities to Champion Trailer Acquisition Company for one dollar. As this Court is also aware from prior papers on file, Plaintiff's contract with Champion Trailer, Inc. was not signed until February 10, 2003 and Plaintiff was unaware of the existence of Champion Trailer Acquisition Company until discovery started in this litigation. Despite these inconsistencies, the facts at issue in this response take place in 2005 when Champion Trailer Acquisition Company was operating the business known to Plaintiff as "Champion Trailer." Because of this – and hopefully for simplicity – Champion Trailer Acquisition Company will simply be referred to as "Champion Trailer" in this Response.

MRB-W-1192v2.doc                            3

the dispute between the parties had deteriorated to such an extent that PC Sports was preparing to file this lawsuit. Moreover, the alleged payment was not cash, but rather, a "credit memo" dated December 31, 2005, that makes no mention of the Living Quarters Trailer or the June 10, 2005 Bill of Sale (*See* Exhibit 3, Credit Memo). Rather the "credit memo" references Invoice Number 000000059-CM, an invoice which has never been produced (*Id)*. Despite requests for production by PC Sports, DC Investments has been unable to produce <u>any</u> documents which corroborate that this "Credit Memo" has anything to do with the Living Quarters Trailer Bill of Sale. In fact the only documents produced specifically indicate that <u>only cash</u>, and not the transfer of a trailer, may be used to pay debts between Champion Trailer and DC Investments (*See* Exhibit 4, line of credit). Moreover, even if DC Investments could corroborate this "Credit Memo", the intent of Champion Trailer and DC Investments is clear: to hinder, delay or defraud PC Sports by transferring the trailer after being threatened with litigation and then six months after the fact attempting to create some type of consideration for their fraudulent transfer.

<u>Furthermore, on June 10, 2005, it is alleged (and thus far undisputed) that Champion Trailer was insolvent and that this Living Quarters Trailer was the only significant asset in Champion Trailer's possession.</u>[2]

> *B.     Champion Trailer and its Affiliated Companies Retained Possession or Control of the Living quarters Trailer After the Transfer.*

Moreover, even after the Living Quarters Trailer was purportedly "sold" to DC Investments on June 10, 2005, Champion Trailer retained possession of the trailer for months. It was not until October 2005 that the Trailer was moved to Indiana where DC Investments is located (*See* Exhibit 5, Response to Interrogatory 8).

---

[2] Plaintiff is currently in multiple discovery disputes with Champion Trailer, one of which being Champion Trailer's refusal to identify its assets and liabilities on or about June 10, 2005. For purposes of this motion, this allegation should be taken as true by this Court.

The Living Quarters Trailer then stayed in Indiana until either shortly before or shortly after this court issued its previous order denying DC Investments motion to dismiss on April 25, 2007.  <u>Apparently either immediately before or immediately after DC Investments learned it would not be dismissed from this litigation it hastily sold the trailer again</u>.  And again the trailer was sold to an insider company, Elite Motorsports.  This time the trailer was sold for only $125,000, less than half of what DC Investments purported "paid" for the trailer fourteen months earlier (*See* Exhibit 6, Response to Interrogatory number 2).  Moreover, although requested by PC Sports, DC Investments apparently has <u>no documentation</u> regarding this sale from DC Investments to Elite Motorsports (See Exhibit 7, Response to Request number 6).

C.     *The Parties Involved in these Transactions were Insiders*

The Living Quarters Trailer has been transferred between insider companies, with little to no documentation supporting these transactions and with little to no evidence that payments were made in consideration of these transactions.

The Members of Champion Trailer Acquisition Company, LLC d/b/a Champion Trailer are Tim Durham and Terry Whitesell (*See* Exhibit 6, Response to Interrogatory number 3).  The Members of DC Investments, LLC are Tim Durham and James F. Cochran (*See* Exhibit 8, Response to Interrogatory number 3).  When Champion Trailer was threatened with litigation from an attorney for PC Sports and told not to transfer the Living Quarters Trailer, Champion Trailer immediately transferred the trailer to an insider company, DC Investments, in an effort to hinder, delay, or defraud PC Sports.

Next, either immediately prior or subsequent to this Court's April 2007 order denying DC Investments motion to dismiss, the trailer was transferred again.  This time to another insider company Elite Motorsports.  Elite Motorsports is currently in a partnership with the former Executive Vice President of Champion Trailer, Michael Brotherton.  Mr. Brotherton worked for

MRB-W-1192v2.doc                                              5

Champion Trailers and was PC Sports' primary contact there. Michael Brotherton operated a company affiliated with Champion Trailers, Dallas Motor Sports Marketing out of the same location as Champion Trailer (*See* Exhibit 9, Deposition of Michael Brotherton pages 1 -16). In fact, in a press release put out by Champion Trailer, Mr. Brotherton and Dallas Motorsports Marketing's interrelated relationship with Champion Trailer is described this way:

> Mike Brotherton has been named Executive Vice President of Champion Trailer, L.P. Brotherton, a former Top Fuel national event winner, will also continue to serve as president of Champion's affiliate, Dallas Motorsports Marketing, which sell used transporters, trailers and tractors.

(*See* Exhibit 10, press release).

Michael Brotherton and Dallas Motorsports Marketing, Inc. continued to be affiliated with Champion Trailer until at least August 2006 (*See* Exhibit 9, pages 1 -16). After which, Michael Brotherton and Dallas Motorsports Marketing went into partnership with Elite Motorsports, LLC. (*See* Exhibit 11, Elite Motorsports website) which as of April 2007 had possession of the Living Quarters Trailer.

*D.     DC Investments Actions were Purposefully Directed at Nevada*

It is undisputed that Tim Durham, one of two owners of Champion Trailer, was aware of the dispute between PC Sports and Champion Trailer on June 10, 2005, when the Living Quarters Trailer was hastily transferred to DC Investments, also owned by Tim Durham. Without a doubt, both Tim Durham and Michael Brotherton (both of whom have both been deposed in this litigation) were aware of this litigation and this Court's orders when DC Investments again hastily transferred the Living Quarters Trailer to Elite Motorsports in April 2007.

The actions of DC Investments were taken with the actual intent to hinder, delay, or defraud PC Sports. The actions of DC Investments were taken with full knowledge of PC Sports and PC Sports' rights in the trailer. The actions of DC Investments were taken with full

MRB-W-1192v2.doc                                              6

knowledge that there was a dispute concerning the Living Quarters Trailer, with PC Sports, a Nevada corporation which had purchased the trailer. The actions of DC Investments were taken with full knowledge that Champion Trailer was insolvent and its only significant asset was the Living Quarters Trailer. The actions of DC Investments amount to an intentional participation of a fraudulent transfer of assets purposefully directed at PC Sports with the purpose of harming Plaintiff in Nevada. <u>Furthermore, the actions of DC Investments were taken with full knowledge that Nevada would be the forum for any dispute concerning the Living Quarters Trailer pursuant to the written contract between Champion Trailer and Plaintiff</u>. (*See* Exhibit 12, Contract for the Living Quarters Trailer).

II. **ARGUMENT**

A. **PLAINTIFF HAS SET OUT A PRIMA FACIE CASE OF FRAUDULENT TRANSFERS INVOLVING DC INVESTMENTS**

As this Court set out in its April 25, 2007 order,

> Under Nevada law, a transfer is fraudulent if the debtor made the transfer:(a) With actual intent to hinder, delay or defraud any creditor of the debtor;
> . . .
> In determining whether the debtor acted with actual intent, the fact finder may consider whether the transfer was made to an insider; the debtor retained possession or control of the property after the transfer; the debtor concealed the transfer; the debtor had been sued or threatened with suit before making the transfer; the debtor transferred substantially all his assets; the debtor absconded; and the debtor removed or concealed assets. Nev. Rev. Stat. § 112.180(2). Additionally, the fact finder may consider whether the value of the consideration the debtor received was reasonably equivalent to the value of the asset transferred; the debtor was insolvent or became insolvent shortly after the transfer; the debtor transferred the asset around the time he incurred a substantial debt; and the debtor transferred the business's essential assets to a lienor who transferred the assets to an insider of the debtor. *Id*.
>
> *Pat Clark Sports, Inc. v. Champion Trailers, Inc*., 487 F. Supp. 2d 1172, 1177-1178 (D. Nev. 2007).

Here, Champion Trailer, <u>an insolvent company</u> which had just received a letter from

MRB-W-1192v2.doc                    7

Plaintiff's attorney <u>threatening litigation</u> and demanding that the Living Quarters Trailer not be transferred, immediately transferred the Living Quarters Trailer, <u>its only significant asset</u>, to DC Investments, LLC, an <u>insider company</u>. DC Investments was fully aware of the dispute between Champion Trailer and Plaintiff. Although the transfer appeared to occur on paper, Champion Trailer <u>retained possession</u> of the Living Quarters Trailer for months after the transfer allegedly took place. In addition, although the transfer agreement indicates that DC Investments paid $300,000 <u>in cash</u> for the trailer on June 10, 2005 as the purchase price for the trailer, it is undisputed that DC Investments <u>did not make any payments</u> (cash or otherwise) on June 10, 2005. DC Investments actions were taken with the actual intent to hinder, delay or defraud Plaintiff.

**B.     APPLICABLE LAW REGARDING VENUE AND PERSONAL JURISDICTION**

*1.     Venue for a Corporate Defendant Stretches to the Limits of Personal Jurisdiction*

The District of the Nevada is the proper venue for this action. The statute that defines the residence of a corporation for purposes of venue determinations provides that "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." (28 U.S.C. § 1391(c)). As each of the defendants is subject to personal jurisdiction in Nevada, all of the defendants are said to reside in Nevada for purposes of venue. Venue is therefore proper against all of the defendants pursuant to 28 U.S.C. § 1391(a) which provides in pertinent part,

> (a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in
>
> (1) a judicial district where any defendant resides, if all defendants reside in the same State
>
> 28. U.S.C. § 1391.

As explained below, because personal jurisdiction is proper against DC Investments in Nevada, venue is likewise proper in the District of Nevada.

*2.     The Proper Limits of Personal Jurisdiction in this Case are the Limits of Due Process Set by the U.S. Constitution*

Whether a party is subject to personal jurisdiction in a Federal Court action based on diversity is determined by reference to the laws of the state in which the Federal Court sits (Fed. R. Civ. P. 4(k)(1)(A)). In Nevada, the long-arm statute, NRS § 14.065, reaches the limits of due process set by the United States Constitution. *See Judas Priest v. District Court*, 104 Nev. 424, 426, 760 P.2d 137, 138 (1988).

In order to obtain personal jurisdiction over a nonresident defendant, the Due Process Clauses of the Fourteenth Amendment requires that the defendant have "minimum contacts" with the forum state such that the maintenance of the suit within the forum state does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945). Additionally, a forum state's exercise of jurisdiction over a defendant must be reasonable. *Trump v. District Court*, 109 Nev. 687, 692, 857 P.2d 740, 744 (1993).

While DC Investments has raised the defense of a lack of personal jurisdiction, PC Sports needs "only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid defendant's motion to dismiss." *Data Disc, Inc v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).

C.  **CASE LAW FROM OTHER DISTRICT AND CIRCUIT COURTS SUPPORTS A FINDING THAT DC INVESTMENTS IS SUBJECT TO SPECIFIC JURISDICTION IN NEVADA**

This Court correctly pointed out in its April 25, 2007 order that the United States Court of Appeals for the Ninth Circuit has not addressed whether a party engaging in a fraudulent transfer outside of the forum state purposefully directly its activities at the forum state. Nevertheless,

MRB-W-1192v2.doc                9

significant case law from other District and Circuit Courts supports a finding of specific jurisdiction where a defendant engages in a fraudulent transfer knowing that the effect of the transfer would be aimed at a forum resident.

In *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552 (6th Cir. 2007), the plaintiff, a Michigan a judgment creditor, sued the defendants, a Kansas company and a Kansas resident, claiming under various theories that defendants engaged in a fraudulent transfer of assets to avoid a debt that accrued from credit purchases. The U.S. District Court in Michigan granted defendants' motion to dismiss for lack of personal jurisdiction. On appeal, the Sixth Circuit reversed and held,

> In the present case, Air Products alleges that Defendants knew that it owed a judgment debt to Air Products at the time it engaged in the allegedly fraudulent transfer, and Air Products alleges that Defendants transferred the assets with the intent to hinder, delay, or defraud Air Products. Defendants also undoubtedly knew that Air Products had its principal place of business in Michigan, and that the focal point of its actions and the brunt of the harm would be in Michigan. We find, therefore, that Defendants' contacts with Michigan are enhanced by its conduct which, at least as alleged, was intentionally directed to cause harm to a Michigan resident.

*Air Prods. & Controls, Inc.* at 552.

Federal District Courts have held similarly. Two recent cases include a case from a District Court in Texas and another from a District Court in Pennsylvania. In the case out of a District Court in Texas, the plaintiff asserted that two Oklahoma companies engaged in a fraudulent transfer of assets to preventing plaintiff from recovering on a debt. The Oklahoma companies moved to dismiss for lack of personal jurisdicition and the District Court denied the motion. The court held,

> Movants, in their motions to dismiss, argue that, even assuming the asserted "fraudulent transfers" occurred, all of the activity happened in Oklahoma and therefore, movants do not have minimum contacts with Texas sufficient to confer personal jurisdiction on this court. Momax filed oppositions in which it maintains that movants'

MRB-W-1192v2.doc                               10

> activities, in fraudulently transferring assets in Oklahoma, were directed at Momax, a citizen of Texas, because the purpose of the transfers was to avoid paying the judgment rendered in the Texas underlying lawsuit in favor of Momax.
>
> . . .
>
> The court concludes that Momax has met its burden in showing that movants' actions created a substantial connection with Texas. *See Burger King*, 471 U.S. at 475. Thus, the court further concludes that the minimum contacts prong of the due process requirement is satisfied.

*Momax, LLC v. TRC Nutritional Labs., Inc*., 2007 U.S. Dist. LEXIS 60190 (D. Tex. 2007).

In another recent case out of a District Court in Pennsylvania, a plaintiff sued out of state defendants it accused of fraudulently transferring assets. The defendants denied they committed any fraudulent acts, and argued that, even if they did, any such conduct occurred strictly out of state, and they could not have foreseen any harmful consequences in Pennsylvania. The court disagreed and held,

> In this case, there is no question that (assuming the facts of the complaint to be true at this stage of the proceedings) defendants committed an intentional tort, namely fraudulent conveyances to avoid a court judgment, and that the harm was felt in Pennsylvania by the Pennsylvania plaintiff, who holds the presently unenforceable Pennsylvania judgment. The dispute herein hones in on the third prong of the tort out/ harm in jurisdictional hook: did defendants expressly aim their "tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity."
>
> Although, as defendants correctly proclaim, none of their physical or metaphysical conduct took place in Pennsylvania, their conduct certainly was directed at Pennsylvania. The fraudulent transfer of assets from judgment debtor Douglas Baumgartner to his transferees, through a series of transactions successfully designed to insulate his assets from the reach of Pennsylvania creditors holding a Pennsylvania judgment, could only be aimed at Pennsylvania.

*C.D. Acquisition Holdings, Inc. v. Meinershagen*, 2007 U.S. Dist. LEXIS 4342, 14-15 (D. Pa. 2007).

/ / /

/ / /

MRB-W-1192v2.doc                    11

### D. THE FACTS SUPPORT A FINDING THAT DC INVESTMENTS IS SUBJECT TO SPECIFIC JURISDICTION IN NEVADA UNDER NEVADA LAW

DC Investments actions subject it to specific jurisdiction in Nevada. While the cases cited above involve fraudulent transfer claims brought after a judgment was entered, the legal principals are the same whether the fraudulent transfer is discovered before or after a judgment is entered. In this case, on of the principal claims against Champion Trailer is that PC Sports paid Champion Trailer approximately $138,000 to construct a Living Quarters Trailer and Champion Trailer kept both the money and the trailer (*See* Exhibit 13, checks paid by PC Sports). When Plaintiff threatened suit, Champion Trailer hastily transferred the trailer (on paper at least) to DC Investments, an insider company (*See* Exhibits 1 and 2). DC Investments was aware of the dispute, was aware that PC Sports was a Nevada company, and was aware that the contract between PC Sports and Champion specifically indicated that all disputes regarding the Living Quarters Trailer would be heard in Nevada (*See* Exhibit 12). Moreover it is undeniable that DC Investments and Michael Brotherton were aware of this litigation in April 2007 when the Living Quarters Trailer was again fraudulently transferred in a further effort to hinder, delay or defraud PC Sports.

Specific jurisdiction requires only that a party have "minimum contacts" with the forum state. *Burger King v. Rudzewicz*, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). The Ninth Circuit applies a three part test to determine "minimum contacts":

> (A) some action must be taken whereby defendant purposefully avails himself or herself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the forum's laws;
>
> (B) the claim must arise out of or result from defendant's forum-related activities; and
>
> (C) exercise of jurisdiction must be reasonable.

*Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).

Each of these three factors is met under the facts of this case and DC Investments is therefore subject to specific jurisdiction in Nevada.

*1. Purposeful Availment*

In determining whether there has been "purposeful availment," the Ninth Circuit "distinguish[es] contract from tort actions." *Roth v. Garcia Marquez*, 942 F.2d 617, 621 (9th Cir. 1991). In tort cases, "the three elements of purposeful availment . . . are: (1) intentional action; (2) aimed at the forum state; and (3) causing harm that the defendant should have anticipated would be suffered in the forum state." *Ziegler v. Indian River County*, 64 F.3d 470 (9th Cir. 1995).

While DC Investments argues that it does not have physical contacts with Nevada, a defendant need not have physical contacts within the forum, provided its actions are "purposefully directed" toward forum residents. *Burger King v. Rudzewicz*, 471 U.S. 462, 476, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). Purposeful availment is satisfied even by a defendant whose only contact with the forum state is the "purposeful direction" of a foreign act having effect in the forum state. *Calder v. Jones*, 465 U.S. 783, 789, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984). It is enough, therefore, that a defendant directs its tortious or fraudulent conduct toward a resident of the forum state, knowing the effects of the conduct will cause harm. *Id.*

To meet this test, PC Sports need only allege that DC Investments committed an intentional act expressly aimed at the forum state and that the act caused harm, "the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000). Such are the facts of this case. PC Sports alleges that DC Investments participated in a fraudulent transfer of the Living Quarters Trailer to the known detriment of PC Sports, a Nevada corporation with is principal and sole location in Clark County, Nevada. It is undisputed that in February 2003, PC Sports paid

MRB-W-1192v2.doc                                                13

Champion Trailer $25,000 as a down payment on the Living Quarters Trailer and in October paid Champion Trailer $113,020.00 as a progress payment on the Living Quarters Trailer (*See* Exhibit 13). It is undisputed that after construction began on the Living Quarters Trailer a dispute arose between PC Sports and Champion Trailer (*See* Exhibit 1). It is undisputed that at the time the Living Quarters Trailer was being constructed and afterwards when the dispute arose between the parties, Champion Trailer was owned solely by Tim Durham and Terry Whitesell (*See* Exhibit 6, Response to Interrogatory 3). It is undisputed that immediately after being threatened with litigation, Champion Trailer transferred its only significant asset, the Living Quarters Trailer, to DC Investments an insider company also owned and controlled by Tim. Durham (*See* Exhibit 8, Response to Interrogatory 3). It is undisputed that Mr. Durham was fully aware of this dispute at the time the transfer was made. It is undisputed that despite the clear language of the Bill of Sale no payments of any kind where made by DC Investment on June 10, 2005 (*See* Exhibit 2). It is undisputed that for months after June 10, 2005, the trailer remained in the possession of Champion Trailer (*See* Exhibit 5, Response to Interrogatory 8).

More egregiously, even after DC Investments had been sued by PC Sports, DC Investments again fraudulently transferred the trailer. This time the transfer took place in April 2007, either immediately before or immediately after this court denied DC Investments first motion to dismiss (*See* Exhibit 6, Response to Interrogatory 2). DC Investments transferred the Living Quarters Trailer for less than half of what DC Investments allegedly "paid" for the trailer to another insider company in partnership with Michael Brotherton, Champion Trailer's executive vice president and PC Sports primary contact during the construction of the Living Quarters Trailer (*See* Exhibit 6, Response to Interrogatory 2 and Exhibit 9). These facts set out a claim for a fraudulent transfer of assets between insiders with an actual intent to hinder delay and defraud PC Sports.

MRB-W-1192v2.doc                           14

The facts of this case are that DC Investments committed intentional acts expressly aimed at PC Sports, a corporation based in Nevada. The facts of this case are that DC Investments knew that the harm its acts would cause were likely to be suffered in Nevada. Clearly the actions of DC Investments have purposefully availed it to the laws of Nevada at least as far as its actions relate to its intentional fraudulent transfer of assets.

*2.  Arising out the defendants forum related activities*

The Ninth Circuit relies on a "but for" test to determine whether a particular claim arises out of a party's forum-related activities and thereby satisfies the second requirement for specific jurisdiction. *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). Here the only forum related activities alleged by PC Sports are directly related to its claim against DC Investments. But for the alleged activity directed at Nevada, no harm would have resulted to PC Sports. Specifically, Plaintiff's claim for a fraudulent transfer of assets involving DC Investments would not exist but for DC Investments activities directed at Nevada (i.e. surreptitiously acquiring property without receiving reasonably equivalent value or with an actual intent to hinder, delay or defraud PC Sports knowing that its actions would cause the brunt of harm in Nevada).

*3.  Exercise of jurisdiction over DC Investments is reasonable*

The third and final prong of the jurisdictional analysis is that the exercise of jurisdiction must be reasonable. Here, it is more than reasonable for this Court to exercise personal jurisdiction over DC Investments. Not only were its actions purposefully directed a Nevada corporation, <u>but DC Investments, knew that the contract between PC Sports and Champion Trailer selected Nevada as the forum to hear all disputes regarding the Living Quarters Trailer</u>. By taking possession of the Living Quarters Trailer immediately after Champion Trailer had been threatened with a lawsuit, DC Investments was on full notice that it might be hauled into court in Nevada.

Once purposeful availment has been established as it has under the facts of this case, the

MRB-W-1192v2.doc                                            15

forum's exercise of jurisdiction is presumptively reasonable. To rebut that presumption, a defendant "must present a compelling case" that the exercise of jurisdiction would, in fact, be unreasonable. *Burger King*, 471 U.S. at 476) (emphasis added). <u>DC Investments has not presented any such compelling case in its motion and it would be unfair to allow DC Investments to present these arguments for the first time in a reply brief when no rebuttal could be made by Plaintiff</u>.

Based on this evidence, DC Investments has sufficient, "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

### III. CONCLUSION

Specific jurisdiction is present against DC Investments due to DC Investments intentional commission of acts amounting to a fraudulent transfer of a custom trailer, the construction of which was paid for by Plaintiff; and the fact that DC Investments took these intentional acts with full knowledge of Plaintiff, with full knowledge of Plaintiff's rights, and with full knowledge that the intentional harm caused Plaintiff would be directed to Nevada, the corporation's sole place of business and where the custom trailer was to be delivered. Venue is proper in Nevada against DC Investments, a corporation, as DC Investments is subject to personal jurisdiction in Nevada.

DATED this 15th day of February, 2008.

Respectfully Submitted,

Weide & Miller, Ltd.

/s/ Mark Borghese
_____
Mark Borghese, Esq.
7251 W. Lake Mead Blvd., Suite 530
Las Vegas, NV 89128
Attorneys for Plaintiff

MRB-W-1192v2.doc                                    16